51 F.3d 1540
 Donald LENZ, Shirley Lenz, his wife, Plaintiffs-Appellants,
v.
Mary WINBURN, individually, for her official acts, and in
her official capacity as Investigator for the Florida
Department of Health and Rehabilitative Services, Doris
Paskewitz, individually, for her official acts, and in her
official capacity as Guardian Ad Litem, with the State of
Florida, or individually, for acts outside the scope of her
official authority, Volusia County, a governmental entity,
Elizabeth Lenz, individually, Defendants-Appellees,
Robert L. Vogel, Jr., in his official capacity as Sheriff of
Volusia County, Florida, W. Piser, in his official capacity
as Deputy Sheriff of Volusia County, Florida, M. Lusk, in
his official capacity as Deputy Sheriff of Volusia County,
Florida, Department of Health and Rehabilitative Services,
an agency of the State of Florida, Guardian Ad Litem Program
for the Seventh Judicial Circuit, an agency of the State of
Florida, Defendants.
 No. 93-3340.
 United States Court of Appeals,
Eleventh Circuit.
 May 12, 1995.
 
 Andrew C. Moler, Orlando, FL, for appellants.
 Kenneth J. Servay, Appellate Advocacy Program-Tulane Law School, New Orleans, LA, Nina E. Vinik, A.C.L.U. Foundation of Fla., Miami, FL, for amicus curiae ACLU.
 Michael Vance Matthews, Blakeney and Alexander, Charlotte, NC, for NCNB Bank.
 Edmund T. Woolfolk, Woolfolk, Estex, Keough and Jordan, John E. DuBose, Jr., Orlando, FL, for Winburn.
 Paolo G. Annino, Central FL Legal Services, Inc., Sylvia Starbuck, Daytona Beach, FL, for Elizabeth Lenz.
 Tura Schnebly Broughton, Asst. County Atty., Legal Department, DeLand, FL, for County of Volusia.
 Arthur C. Wallberg, Office of the Atty. Gen., Tallahassee, FL, for Paskewitz.
 Appeal from the United States District Court for the Middle District of Florida.
 Before HATCHETT and COX, Circuit Judges, and JOHNSON, Senior Circuit Judge.
 COX, Circuit Judge:
 
 
 1
 Plaintiffs Donald and Shirley Lenz sued Mary Winburn, Doris Paskewitz, Elizabeth Lenz, and Volusia County, Florida under 42 U.S.C. Sec. 1983 for violation of their Fourth and Fourteenth Amendment rights. The district court granted all defendants summary judgment. The Lenzes appeal.
 
 I. Background
 A. Facts
 
 2
 Donald and Shirley Lenz (the elder Lenzes or the Lenzes) have a son named Kurt.[1] For a time Kurt Lenz was married to the defendant Elizabeth Lenz. Elizabeth had a son of her own named Ryan. Kurt and Elizabeth together had a daughter named Desirae, whom the elder Lenzes call "Mickey." When Kurt and Elizabeth separated in 1990, nine-year-old Desirae became the subject of a bitter custody fight. Kurt ultimately obtained primary custody. In the autumn of 1990, Desirae lived with her father, who resided in half of a duplex owned by the elder Lenzes. A doorway connected the duplex's two kitchens, effectively making the duplex into one large dwelling. This connection between the duplexes facilitated the elder Lenzes' care for Desirae, whom they often babysat when Kurt was at work.
 
 
 3
 In September 1990, the elder Lenzes reported to the Florida Department of Health and Rehabilitative Services (HRS) that Elizabeth had abused Desirae and Ryan by pouring dish soap down their throats. HRS assigned the case to Mary Winburn, an investigator. During the next six weeks, Winburn interviewed acquaintances, neighbors, and family of the Lenzes and Elizabeth. She also spoke to Doris Paskewitz, who was appointed Desirae's guardian ad litem in late October 1990. Based on her investigation, Winburn concluded that the accusations against Elizabeth were groundless, but that the elder Lenzes and Kurt abused Desirae.
 
 
 4
 Accordingly, Winburn resolved to remove Desirae from her father's custody immediately. She arranged to meet Paskewitz at Desirae's school. Winburn notified the principal that she and Paskewitz would arrive at the end of the school day to take Desirae and place her with Elizabeth. Winburn did not, however, apprise the elder Lenzes. Fearing a confrontation, the principal asked the Volusia County Department of Public Safety to provide two deputies to keep the peace. Winburn later sought the deputies' assistance at the Lenzes' house as well because of the Lenzes' reputation among their neighbors as firearm enthusiasts.
 
 
 5
 In addition to preparing to retrieve Desirae, Winburn made arrangements to collect Desirae's necessities. HRS caseworkers typically take some of the child's belongings when they remove a child, in order to lessen the child's trauma. Following this practice, Winburn had telephoned and visited Elizabeth to determine what would ease Desirae's move from her father's home to her mother's. Elizabeth asked for some of Desirae's clothing, some toys, a video game, and a set of child's encyclopedias Desirae used in her schoolwork.
 
 
 6
 Consequently, after Shirley and the deputies arrived at the school and Winburn explained the situation to Shirley and Desirae, Winburn, Paskewitz, Desirae, Shirley, and the two deputies all went to the Lenzes' duplex to gather Desirae's necessities. The parties dispute what happened there. The elder Lenzes contend that Winburn, Paskewitz, and the deputies entered the townhouse without permission. Donald testified that he said nothing to indicate to the deputies or Winburn that they were allowed in the house. Rather, Donald merely unlocked the gate to the townhouse's front courtyard and told the deputies that he was going to put on his shoes. As he turned to fetch his shoes, Donald testified, the deputies followed him into his house uninvited, with Winburn close behind. Shirley likewise denied having invited Winburn and the others into the house.
 
 
 7
 Winburn, on the other hand, testified that the deputies asked for permission to enter and that Donald explicitly consented, saying something like "come on" as he turned around to enter the house. She also testified that she had explained to Shirley at the school what she would be doing and that Shirley had agreed to it. Paskewitz testified that she entered last at Desirae's invitation, and that when she went in she greeted the elder Lenzes. She did not explicitly ask for consent to enter, but was not told to leave.
 
 
 8
 The parties agree that everyone came through the living room of the elder Lenzes' side of the duplex. The parties apparently also agree that Desirae and Paskewitz first went back to Desirae's room. Paskewitz testified that while they were there Desirae showed her a pet bird. Paskewitz also attested that she then asked Shirley to come to Desirae's room to help select clothing; Shirley testified that Paskewitz asked her to comfort Desirae. Shirley and Winburn then went to Desirae's room. What happened there is also disputed. Shirley testified that she comforted a sobbing Desirae as Paskewitz and Winburn rifled through Desirae's closet and that Winburn removed armloads of clothing. Paskewitz testified that everyone in the room helped select clothing and that little clothing was gathered or taken.
 
 
 9
 Winburn then carried the clothing and other items past Donald and the deputies out to her car. Winburn testified that she asked about each item as she left. The Lenzes testified that Winburn took what she liked without consulting them. After Desirae's belongings were in Winburn's car, Paskewitz, Desirae, Winburn, and the deputies left.
 
 
 10
 The parties dispute what Winburn took, and they dispute whether Paskewitz removed anything. Winburn and Paskewitz both testified that Winburn took some clothing, a video game, and a set of encyclopedias. The Lenzes testified that in addition Winburn took the pet bird, bed linens, and an assortment of stuffed animals. The Lenzes also claim that $1987 in cash, an answering machine, and a box of craft supplies disappeared during Winburn's visit. Neither Lenz saw any defendant take the machine or the cash, however, but maintain that either Winburn or Paskewitz could have done so.
 
 B. Procedural History
 
 11
 The elder Lenzes sued the defendants pursuant to 42 U.S.C. Sec. 1983, contending that Winburn and Paskewitz's visit violated the Lenzes' Fourth and Fourteenth Amendment rights. The Lenzes also claim that Elizabeth Lenz conspired to deprive them of their Fourth and Fourteenth Amendment rights, and that Volusia County's policy of providing deputies to keep the peace in these circumstances was an unconstitutional practice.
 
 
 12
 The district court granted summary judgment to all defendants. It determined that Winburn was qualifiedly immune to the Lenzes' claim against her individually and that the Eleventh Amendment barred the claim against Winburn in her official capacity. The court concluded that qualified immunity entitled Paskewitz to summary judgment on the claim against her individually. The court also ruled that Paskewitz's conduct did not implicate the Fourth Amendment, and that therefore she was entitled to summary judgment on the claim against her in her official capacity. The court granted Elizabeth Lenz summary judgment for want of evidence of a conspiracy to violate the Lenzes' constitutional rights. Finally, the district court granted Volusia County summary judgment, having found no evidence of an unconstitutional policy or practice.
 
 II. Issues on Appeal
 
 13
 The elder Lenzes raise one issue requiring discussion. They contend that the district court improperly determined that Winburn and Paskewitz merited qualified immunity from the suits against them individually, and that the district court improperly held in the alternative that the Lenzes had stated no Fourth Amendment claim.[2]
 
 III. Standard of Review
 
 14
 This court reviews summary judgments de novo, applying the same standards as the district court. E.g., Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 996 (11th Cir.1990).
 
 IV. Discussion
 
 15
 The defendants in this case are in materially different legal positions, so we discuss each in turn. Our consideration of each summary judgment is guided by the ordinary principles of summary judgment law. We must view the facts in the light most favorable to the party opposing the motion, drawing all reasonable inferences in that party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate when the summary judgment record shows no issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c).
 
 A. Doris Paskewitz
 
 16
 The district court concluded that Paskewitz was entitled to qualified immunity because she was acting within her discretion as a guardian ad litem, and that the Lenzes failed to establish that helping a child select items for her use violates the Fourth Amendment. The Lenzes contend that the law was clearly established that Paskewitz's actions violated the Fourth Amendment. However, we need not reach the question whether any Fourth Amendment right was clearly established because we conclude that Paskewitz failed to show that she was acting within her discretionary authority. Paskewitz is thus not entitled to qualified immunity. See Jordan v. Doe, 38 F.3d 1559, 1565 (11th Cir.1994). Since we determine that Paskewitz merits no qualified immunity, we must address the district court's holding that the Fourth Amendment does not forbid Paskewitz's conduct.[3] Although we differ in our reasons, we agree that Paskewitz did not violate the Lenzes' Fourth Amendment rights. We accordingly affirm the summary judgment.
 
 1. Qualified Immunity
 
 17
 "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added). This circuit uses a two-step analysis to determine whether qualified immunity is available. First, the defendant must show that she acted within the scope of her discretionary authority. Jordan, 38 F.3d at 1565; Ziegler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983). Once the defendant has so shown, the plaintiff must show that the defendant violated the plaintiff's clearly established statutory or constitutional rights. Id. A government official acts within her discretionary authority if the actions were (1) "undertaken pursuant to the performance of [her] duties" and (2) "within the scope of [her] authority." Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir.1988).
 
 
 18
 Paskewitz has not shown that her actions at the Lenzes' house were within the scope of her authority under Florida law. In Florida, judges may appoint guardians ad litem in marriage dissolution, custody, and similar proceedings "to act as next friend of the child, investigator or evaluator...." Fla.Stat.Ann. Sec. 61.401 (West Supp.1995). Section 61.403 of the Florida Statutes provides a nonexclusive list of the guardian's duties.[4] Although the list is nonexclusive, every included duty is judicially related: the guardian has authority to investigate the pleadings, compel discovery, request expert examinations, make statements to the court, and file motions. The list includes no duty to counsel, shelter, or care for the child directly.
 
 
 19
 The Florida Guardian ad Litem Program training manual likewise emphasizes the guardian's judicial rather than caretaking role:
 
 
 20
 Without the court's permission, you have no status or function. You should understand that your duties are both temporary and limited in scope.... You must realize that the judge appoints you guardian ad litem. You are not the child's legal guardian or trustee. You have no power over the child's person or property. You have no right to interfere with the child's person or property.
 
 
 21
 Florida Guardian ad Litem Program, Manual for Volunteers 11 (n. d.) (R2-85-exh.1). The Program's list of the guardian's duties similarly excludes nonjudicial functions. Although the guardian is expected to be a "monitor" and "protector," the training manual's description of these roles mentions only the guardian's interaction with other state officials concerned with the child. For instance, as a monitor the guardian ad litem must determine if the child needs counseling or medical tests; if so, the guardian "can't provide these services [her]self, [but] can continue to monitor the situation and make sure the persons responsible are accomplishing their tasks." Id. at 8. As protector, the guardian sees that "the child's physical, psychological, developmental and legal needs are met." Id. However, the guardian does so by "keep[ing] the case on track, prodding, pushing, reminding, in short, speaking out, until the system effectively meets the child's best interest." Id. The statute and the Guardian ad Litem Program's own interpretation of the statute both describe the guardian as the child's legal representative, not as the child's caretaker or guardian. The guardian's duty to act in the child's best interest requires the guardian to act only in the child's best legal interest.
 
 
 22
 Paskewitz may have acted as a compassionate and decent person in deciding to provide support and a "neutral presence" at the Lenzes' as Desirae underwent a traumatic experience, (R.2-75-exh.B p T), but she acted outside the scope of her authority as Desirae's guardian ad litem. In being present for Desirae, she was directly providing comfort rather than using her status as an appointed officer of the court to urge the system to look after Desirae. Neither Florida statutes nor the training manuals of the Guardian ad Litem Program require a guardian to care directly for the child. Paskewitz therefore went beyond the call of duty.
 
 
 23
 Because Paskewitz acted outside the scope of her authority, she is not entitled to qualified immunity.[5] Rich, 841 F.2d at 1564. We therefore must reach the merits of the Lenzes' Fourth and Fourteenth Amendment claims against her.
 
 2. The Fourth Amendment Claims
 
 24
 The Fourth Amendment, as applied to the states by way of the Fourteenth, Ker v. California, 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963), protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. 4. The Lenzes apparently base their Fourth Amendment claim on three of Paskewitz's actions: her warrantless entry into their house, her search of Desirae's belongings, and the alleged seizure of the cash and the answering machine.[6] As to the third basis, we find no issue of material fact as to whether Paskewitz took any property. The Lenzes, who were present, testified that they did not see Paskewitz remove anything from the house, and Paskewitz denies having done so. We therefore affirm summary judgment as to the seizure claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Below, we consider only whether Paskewitz's entry and her selection of Desirae's clothing were searches violative of the Fourth Amendment.
 
 
 25
 A preliminary issue in this unusual case is whether Paskewitz's conduct implicated the Fourth Amendment at all.[7] The district court concluded that the Lenzes had stated no Fourth Amendment claim against Paskewitz because her conduct was not motivated by an investigative purpose. (R.5-164-8.) However, as the Supreme Court has explained, "the right against unreasonable seizures would be no less transgressed if the seizure ... was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." Soldal v. Cook County, Ill., --- U.S. ----, ----, 113 S.Ct. 538, 548, 121 L.Ed.2d 450 (1992). We perceive no reason, and Paskewitz advances none, that the Fourth Amendment's protection against invasions of privacy should be any more circumscribed than its protection of the property interest at issue in Soldal. We conclude thus that the language of Soldal is equally applicable to this case. Consequently, even though Paskewitz looked through Desirae's clothes out of concern for Desirae's comfort and not as part of any investigation, the search falls within the ambit of the Fourth Amendment.
 
 
 26
 a. Entry into the Lenzes' House
 
 
 27
 Once within that ambit, Paskewitz infringed upon a reasonable expectation of privacy when she entered the Lenzes' house. Citizens' security in their houses lies at the core of the Fourth Amendment. Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). However, Paskewitz contends, correctly in our opinion, that Desirae consented to the entry.[8] Valid consent legitimates an otherwise unconstitutional search. E.g., Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Anyone who "possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected" may consent to the search of another's property. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).
 
 
 28
 The authority which justifies the third-party consent does not rest upon the law of property ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
 
 
 29
 Id. n. 7. Matlock's third-party consent rule applies even when a present subject of the search objects. See, e.g., United States v. Donlin, 982 F.2d 31, 33 (1st Cir.1992); United States v. Childs, 944 F.2d 491, 495 (9th Cir.1991); J.L. Foti Constr. Co. v. Donovan, 786 F.2d 714, 717 (6th Cir.1986); Donovan v. A.A. Beiro Constr. Co., 746 F.2d 894, 899 n. 4 (D.C.Cir.1984); United States v. Baldwin, 644 F.2d 381, 383 (5th Cir. Unit A 1981); United States v. Bethea, 598 F.2d 331, 335 (4th Cir.), cert. denied, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979).
 
 
 30
 To our knowledge, no federal court of appeals has yet explicitly addressed the capacity of minors to give third-party consent.[9] We hold that minors may so consent. Fourth Amendment rights, unlike rights attendant to due process, do not guarantee a fair and impartial determination of truth; rather, they protect the interest of the citizen "to be let alone." Schneckloth, 412 U.S. at 242, 93 S.Ct. at 2056 (quoting Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966)). Thus, the subject of a Fourth Amendment-violative search need not be aware of her right to refuse to give knowing and voluntary consent. Id. at 249, 93 S.Ct. at 2059. However, the circumstances surrounding the consent must demonstrate that it was voluntarily given, free of duress or coercion. Id.
 
 
 31
 Four reasons support our holding that minors may give third-party consent. First, privacy is an intuitive interest, and legal sophistication is not required even for adults to give valid consent. Id. Hence, minors need not necessarily be presumed incapable of knowing consent. Second, the list of factual considerations bearing upon the voluntariness of the consent is open-ended. See id. The youth of the consenter, with its attendant vulnerability to coercion, is certainly among them. Cf. Haley v. Ohio, 332 U.S. 596, 600, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948). This individualized assessment obviates the need for a categorical rule to protect subjects of searches from subtle coercive tactics to secure a minor's consent. Third, consent searches serve a legitimate purpose that is properly balanced against the cost of limiting a minor's ability to consent. See Schneckloth, 412 U.S. at 228-29, 93 S.Ct. at 2048-49. This balancing counsels against a bright-line rule prohibiting minor consent. Finally, the rationale behind third-party consent involves no notion of agency. Rather, the third-party consent rule recognizes that sharing space with another lessens the expectation of privacy in that space. See J.L. Foti Constr. Co., 786 F.2d at 717. This compromise of the expectation of privacy is no less the case for a minor co-occupant than for an adult.
 
 
 32
 In this case, the summary judgment record shows that there is no dispute about Desirae's authority to consent to Paskewitz's entry into the house. Desirae effectively resided with the Lenzes, because the duplex in which the Lenzes and Desirae lived had been made one house. Desirae had free access to the living room; indeed, Donald testified that "[a]nything in that house is Mickey's [Desirae's] and as far as I'm concerned including the house." (Donald Lenz Dep. at 109.) This undisputed evidence of shared residence and access establishes Desirae's authority to consent. Cf. United States v. De Parias, 805 F.2d 1447, 1458 (11th Cir.1986), cert. denied, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987).
 
 
 33
 Furthermore, no fact issue remains whether Desirae consented to Paskewitz's entry. All parties agree that Desirae entered the living room with Paskewitz, and Donald testified that Desirae and Paskewitz entered holding hands. Although the parties dispute whether Desirae was upset or not at the time, no evidence indicates that Paskewitz or Winburn in any way coerced Desirae into admitting them into the house. Nor does any evidence suggest that in the circumstances a child of Desirae's age would have felt coerced into letting Paskewitz enter to assist in selecting clothes. The undisputed evidence of conduct indicating consent and the absence of any evidence of coercion or duress eliminate any fact issue as to valid consent. Summary judgment was thus appropriate for Paskewitz on the claim based on her entry into the Lenzes' house.
 
 
 34
 b. Search of Desirae's Belongings
 
 
 35
 Paskewitz is also entitled to summary judgment on the claim against her for searching Desirae's belongings, but for a different reason. To benefit from the Fourth Amendment, the Lenzes must show that they have a " 'constitutionally protected reasonable expectation of privacy' " in the object of the alleged search. Oliver v. United States, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740-41, 80 L.Ed.2d 214 (1984) (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). Fourth Amendment rights are personal and may not be vicariously asserted. Rakas v. Illinois, 439 U.S. 128, 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Thus, in a variety of circumstances, courts have held that a person does not have a reasonable expectation of privacy in another's belongings. See, e.g., id. at 148-49, 99 S.Ct. at 433 (no standing to object to the search of another's car); United States v. Bella, 605 F.2d 160, 161 (5th Cir.1979) (no standing to complain of search of a companion's luggage); People v. Rielly, 190 A.D.2d 695, 593 N.Y.S.2d 275, 277 (App.Div.1993) (defendant had no standing to object to search of his son's schoolbag). This is true even when the person claiming the Fourth Amendment right has a reasonable expectation of privacy in the premises where the other's property was found.[10] See Bella, 605 F.2d at 161 (holding that defendant had no standing to object to a search of his companion's luggage, which had been seized from the trunk of the defendant's car).
 
 
 36
 The summary judgment record at best suggests only that Paskewitz searched Desirae's closet and bedroom. It does not appear from the record that the closet was used by anyone but Desirae. Neither do the Lenzes claim any personal rights by virtue of their care for Desirae. Thus, the Lenzes base their illegal search claim against Paskewitz solely on Paskewitz's compromise of Desirae's privacy interest and not on any violation of their own privacy interests. The Lenzes do not contend that Desirae's youth should distinguish this case from other cases in which individuals were found to lack standing to challenge the search of another's property. We therefore conclude that the Lenzes lack standing to claim that Paskewitz violated their Fourth Amendment rights in her search of Desirae's belongings. Summary judgment in Paskewitz's favor was appropriate on this claim.
 
 B. Mary Winburn
 
 37
 The Lenzes apparently base their Fourth Amendment claim against Winburn on four actions: the entry into their house, the seizure of the Lenzes' cash and answering machine, and the search and seizure of Desirae's clothes and other effects. The district court granted summary judgment as to each. For the following reasons, we affirm.[11]
 
 1. The Answering Machine and Cash
 
 38
 Summary judgment was appropriate as to the claim based on Winburn's seizure of the cash and the answering machine. The record includes testimony about the disappearance of these items, but the evidence concerning Winburn's visit does not create a fact issue as to whether Winburn was responsible. Donald testified that he saw Winburn enter the bedroom where the cash was located, but he did not see her carrying anything out of the room. Neither did he see anything in her pockets. Furthermore, Shirley testified that the cash's presence in a dresser drawer was a secret known only to her and Donald, and Donald testified that he heard no sounds that would suggest a search was going on in the bedroom. At best, the Lenzes' testimony suggests only that Winburn could have taken the cash and the answering machine. Winburn denies having done so. The Lenzes have therefore failed to carry their burden of showing that a reasonable jury could find that a seizure occurred. See Anderson, 477 U.S. at 251, 106 S.Ct. at 2511. We accordingly affirm summary judgment as to the claim based on the seizure of the Lenzes' property.
 
 
 39
 2. Entry into the House and Seizure of Desirae's Belongings
 
 
 40
 The district court concluded that Winburn merited summary judgment on the basis of qualified immunity as to the other Fourth Amendment claims. We agree. As discussed above, once a defendant official has shown she is acting within her discretionary authority, the plaintiff must show that the official violated clearly established rights of which a reasonable official would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Jordan v. Doe, 38 F.3d 1559, 1565 (11th Cir.1994). The plaintiff's burden is heavy: "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) (emphasis in original). "Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir.1993).
 
 
 41
 Winburn has carried her burden of showing that she acted within her discretionary authority. Florida statutes permit HRS to take children into protective custody if an HRS investigator determines it necessary to protect the child. See Fla.Stat.Ann. Sec. 39.401(1)(c) (West 1988); id. Sec. 415.505(f)(3) (West 1993) (current version at id. Sec. 415.505(e)(3) (West Supp.1995)). Furthermore, HRS policy is to allow the child to take personal belongings when removed.[12] The Lenzes do not contend that this HRS policy was beyond HRS's authority. Thus, we conclude that Winburn's entry into the house to collect Desirae's needments was within Winburn's discretionary authority.
 
 
 42
 The Lenzes have failed to carry their burden of showing that Winburn's entry into their house and seizure of clothes, stuffed animals, video games, and encyclopedias violated a clearly established constitutional right. First, the Lenzes have cited no caselaw that makes it sufficiently clear that the Fourth Amendment prohibits as unreasonable entries such as Winburn's. Second, the Lenzes failed to show that their property interest in Desirae's belongings was sufficiently apparent to Winburn that a reasonable official in Winburn's position would have known that she was infringing on the Lenzes' property rights in violation of the Fourth Amendment.
 
 
 43
 As to the first weakness in their argument, the Lenzes contend that unwarranted entry into the home is a paradigmatic Fourth Amendment violation, and that the law was therefore clearly established even in the absence of factually similar caselaw. We are unpersuaded. To strip an official of qualified immunity, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense...." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The Fourth Amendment prohibits only unreasonable searches. Unreasonableness is determined by a case-by-case balancing of the state's interests against the individual's. New Jersey v. T.L.O., 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985); see also Marshall v. Barlow's, Inc., 436 U.S. 307, 316-21, 98 S.Ct. 1816, 1822-24, 56 L.Ed.2d 305 (1978) (balancing OSHA's interest in surprise inspections against business owners' privacy interests). In the Fourth Amendment context, therefore, the law of qualified immunity provides that Winburn need not predict whether the interest of the state in retrieving personal effects for a child's comfort will be deemed to outweigh the privacy interests of the suspected abusers. Neither must she err on the side of caution and assume that such searches are unreasonable. See Lassiter, 28 F.3d at 1149. As the Supreme Court has explained, "[i]t simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the official's] search was objectively legally unreasonable." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. Winburn is thus entitled to qualified immunity from the claim based on her entry into the Lenzes' house.
 
 
 44
 The Lenzes have also failed to carry their burden as to the seizure of Desirae's belongings. In particular, they have failed to cite any law or facts available to Winburn that would have led a reasonable official in her shoes to conclude that seizing Desirae's belongings would infringe upon a possessory interest of the Lenzes. Qualified immunity analysis asks the objective question whether a reasonable officer could have believed his conduct lawful under clearly established law in light of the information the officer possessed. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3040. By all the outward circumstances apparent in the summary judgment record, an official in Winburn's shoes would in fact have concluded that Desirae's clothes, stuffed animals, toys, and books belonged to Desirae. The items were in Desirae's room and would appear suitable only to a child's use. The Lenzes asserted no property interest at the time to inform Winburn that the objects were in fact only lent to Desirae for her use while she was in the Lenzes' house. Based on these facts, the only ones available to Winburn at the time, a reasonable official could not have known that taking the items was a seizure in violation of the Lenzes' Fourth Amendment rights.
 
 V. Conclusion
 
 45
 For the foregoing reasons, we AFFIRM summary judgment as to all defendants.
 
 
 46
 AFFIRMED.
 
 
 
 [1]
 For convenience, we refer to all the Lenzes individually by their first names
 
 
 [2]
 The Lenzes also contend that the district court overlooked undisputed evidence showing a conspiracy among Elizabeth, Winburn, and Paskewitz to violate the Lenzes' Fourth Amendment rights. Additionally the Lenzes challenge the district court's determination that Volusia County's custom of providing peacekeeping officers for the HRS was not unconstitutional. Finally, the elder Lenzes contend that the undisputed facts show a violation of their substantive due process rights. Having carefully reviewed the record, we find no reversible error as to these issues and affirm without further discussion. See 11th Cir.R. 36-1(d)
 
 
 [3]
 The district court reached the merits of the Fourth Amendment claim against Paskewitz as part of its qualified immunity analysis, concluding that the Lenzes failed to show violation of a clearly established right because they showed no violation at all. (R.5-164 at 8-9.)
 The district court also reached the merits of the Fourth Amendment claim against Paskewitz in her official capacity. The claim against Paskewitz in her official capacity is a claim against the Guardian ad Litem Program for which Paskewitz volunteered. See Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). To recover against the Program, the Lenzes must show that Paskewitz's conduct was the result of a custom or policy of the Program. See Monell v. Dep't of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Nothing in the record supports a finding that Paskewitz's conduct reflected a policy or custom of the Program. Thus, summary judgment was appropriate for the official capacity suit whether or not Paskewitz's conduct violated the Fourth Amendment. See id.
 We observe that the district court did not refer to the Guardian ad Litem Program, or the courts that sponsor the Program. The district court's silence is understandable because the plaintiffs made no effort to identify precisely whom they intended to sue. The Lenzes' final amended complaint is ambiguous, as was their prosecution of the case. It would have been helpful to the district court and to this court if the plaintiffs had decided whom they wished to sue and named only these persons in their amended pleadings. Such "shotgun pleadings" as those filed serve neither the plaintiffs nor the efficient administration of justice.
 
 
 [4]
 The section provides in full:
 A guardian ad litem when appointed shall act as next friend of the child, investigator or evaluator, not as attorney or advocate but shall act in the child's best interest. A guardian ad litem shall have the powers, privileges, and responsibilities to the extent necessary to advance the best interest of the child, including, but not limited to, the following:
 (1) The guardian ad litem may investigate the allegations of the pleadings affecting the child, and, after proper notice to interested parties to the litigation and subject to conditions set by the court, may interview the child, witnesses, or any other person having information concerning the welfare of the child.
 (2) The guardian ad litem, through counsel, may petition the court for an order directed to a specified person, agency, or organization, including, but not limited to, hospitals, medical doctors, dentists, psychologists, and psychiatrists, which order directs that the guardian ad litem be allowed to inspect and copy any records and documents which relate to the minor child or to the child's parents or other custodial persons or household members with whom the child resides. Such order shall be obtained only after notice to all parties and hearing thereon.
 (3) The guardian ad litem, through counsel, may request the court to order expert examinations of the child, the child's parents, or other interested parties in the action, by medical doctors, dentists, and other providers of health care including psychiatrists, psychologists, or other mental health professionals.
 (4) The guardian ad litem may assist the court in obtaining impartial expert examinations.
 (5) The guardian ad litem may address the court and make written or oral recommendations to the court. The guardian ad litem shall file a written report which may include recommendations and a statement of the wishes of the child. The report must be filed and served on all parties at least 20 days prior to the hearing at which it will be presented unless the court waives such time limit. The guardian ad litem must be provided with copies of all pleadings, notices, and other documents filed in the action and is entitled to reasonable notice before any action affecting the child is taken by either of the parties, their counsel, or the court.
 (6) A guardian ad litem, acting through counsel, may file such pleadings, motions, or petitions for relief as the guardian ad litem deems appropriate or necessary in furtherance of the guardian's function. The guardian ad litem, through counsel, is entitled to be present and to participate in all depositions, hearings, and other proceedings in the action, and, through counsel, may compel the attendance of witnesses.
 (7) The duties and rights of nonattorney guardians do not include the right to practice law.
 (8) The guardian ad litem shall submit his recommendations to the court regarding any stipulation or agreement, whether incidental, temporary, or permanent, which affects the interest or welfare of the minor child, within 10 days after the date such stipulation or agreement is served upon the guardian ad litem.
 Fla.Stat.Ann. Sec. 61.403 (West Supp.1995).
 
 
 [5]
 Although Paskewitz raised absolute immunity as a defense in the trial court, she expressly waives it in her brief to this court. Paskewitz Br. at 17. We therefore need not decide whether guardians ad litem are entitled to judicial immunity
 
 
 [6]
 "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)
 
 
 [7]
 We note that the Fourth Amendment's protection unquestionably extends beyond criminal investigations to civil and administrative contexts. See, e.g., Soldal v. Cook County, Ill., --- U.S. ----, ---- n. 11, 113 S.Ct. 538, 546 n. 11, 121 L.Ed.2d 450 (1992); O'Connor v. Ortega, 480 U.S. 709, 714, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987); Camara v. Municipal Court, 387 U.S. 523, 534, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967)
 
 
 [8]
 We assume, without deciding, that Paskewitz's invasion of the Lenzes' privacy was unreasonable and therefore violated the Fourth Amendment
 
 
 [9]
 The Sixth Circuit has implicitly decided that they may, provided the minor otherwise satisfies the requirements of a third-party consenter. See United States v. Clutter, 914 F.2d 775, 778 (6th Cir.1990), cert. denied, 499 U.S. 947, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991). In Clutter, a police officer was admitted into the defendant's trailer by a co-defendant's twelve- and fourteen-year-old sons, who also resided in the trailer. The officer found a large quantity of marijuana in the defendant's bedroom. Without any mention that the boys' youth might automatically invalidate their consent, the court held that their consent sufficed to legitimate the search
 
 
 [10]
 The Lenzes cite United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir.1990), in support of their contention that a person seeking Fourth Amendment protection from a search needs no reasonable expectation of privacy in the object of the search provided the person has a possessory interest. It is true that a possessory interest is all that is needed for the Fourth Amendment's reasonableness requirement to apply to a seizure. See Soldal v. Cook County, Ill., --- U.S. ----, ----, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992); see also United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (defining a Fourth Amendment seizure as "a meaningful interference with an individual's possessory interest in that property") (emphasis added). This rule does not benefit the Lenzes, however. First, as we mentioned in the text, the evidence at best shows only that Paskewitz searched through Desirae's closet, but seized nothing. The lack of a seizure is a material distinction. See Horton v. California, 496 U.S. 128, 134, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990). Absent a reasonable expectation of privacy, a possessory interest does not support standing to object to a search. United States v. Salvucci, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980) ("We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."). In Delgado, unlike this case, the search and the seizure were inextricably linked. See Delgado, 903 F.2d at 1501 (describing the search and seizure); cf. United States v. Jeffers, 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951). Thus, the possessory interest of the defendant in Delgado sufficed to give him standing. In this case, on the other hand, any arguable possessory interest the Lenzes had in items they had bought for Desirae's use is not enough to support standing
 
 
 [11]
 We affirm summary judgment as to the search of Desirae's belongings because the Lenzes have no reasonable expectation of privacy in those belongings, as discussed above in subsection IV.A.2.b
 
 
 [12]
 HRS policy also provides that if a parent objects to the removal of the child's effects, HRS must provide such personal necessities to the child. However, there is no evidence in this record to suggest that Kurt Lenz objected to Winburn's collection of Desirae's necessities