BIRCH, Circuit Judge,
dissenting:
I respectfully dissent. Although I am outraged by the conduct of the schoolteachers in this case and am convinced that they left their better judgment at home on May 1, 1992,1 cannot conclude that these individuals understood or should have understood that the strip searches that they conducted were violative of the clearly established Fourth Amendment rights of these second-grade students. While it is easy to second-guess school personnel in a courthouse far removed from the tumult and tumble of the work-a-day world of the schoolhouse with the aid of twenty-twenty hindsight, the majority does a grave disservice to our law and to public servants in determining that these individuals violated the exceedingly limited constitutional rights of schoolchildren.[1] See C.B. ex rel. Breeding v. Driscoll, 82 F.3d 383, 385 (11th Cir.1996). Furthermore, no policy had been formulated by the Talladega City Board of Education or the Graham Elementary School regarding student searches during the 1991-1992 school year. Stolen money previously had been recovered through searches of students’ attire at Graham Elementary School.[2] Moreover, as the district judge as *1049 certained, there was no binding, clearly established law that these schoolteachers violated in conducting the challenged strip searches.
“For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant’s place, that “what he is doing’ violates federal law.”[3] Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)) (emphasis added). The Lassiter court admonished that the facts of eases relied upon as precedent must be “materially similar”; “[pjublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.” Id. at 1150 (quoting Adams v. St. Lucie County Sheriffs Dept., 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), adopted en banc, 998 F.2d 923 (11th Cir.1993) (per curiam)) (alteration in original). If the standard for qualified immunity were whether preexisting law had established that the strip searches by the schoolteachers in this ease, when they occurred, might have been unlawful under federal law, then the majority opinion might be correct. That standard, however — the “it might be unlawful” standard — according to the Supreme Court and repeated decisions of this court is not the proper standard. See Muhammad v. Wainwright, 839 F.2d 1422, 1425 (11th Cir.1987) (“[A]t the relevant time, defendants, at best, had only some reason to suspect that their actions might be unlawful. Such a suspicion is inconsistent with the ‘clearly established’ standard enunciated by Harlow [v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)] and its progeny.”); see also Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984) (“[OJfficials should not err always on the side of caution.”); accord Lassiter, 28 F.3d at 1149; Lenz v. Winburn, 51 F.3d 1540, 1551 (11th Cir.1995).
Indeterminacies, speculations, and predictions have no place in our qualified immunity law. Elementary schoolteachers, nonlawyers whose primary responsibilities are education and the daily administration of their classrooms, cannot be required to foresee how the Eleventh Circuit would apply Supreme Court precedent and decide this particular factual situation if presented. That would be not only an unprecedented but also an unreasonable standard. Accordingly, the majority’s reliance on New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), involving the purse search of a high school student and the discovery of contraband, is misplaced because T.L.O. is not factually similar to the strip searches that we review and cannot be clearly established law to resolve this case, much less dicta in T.L.O.
Because of its “practical application,” qualified immunity is judged by the conduct of government personnel at the time that they acted, “not by hindsight, based on later events.” Lassiter, 28 F.3d at 1150; see Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) (“[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.” (emphasis added)). On May 1,1992, the date of the strip searches at issue in this case, there was no clearly established law regarding the unconstitutionality of strip searches of schoolchildren from the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court.[4] See Courson v. McMillian, *1050 939 F.2d 1479, 1498 n. 32 (11th Cir.1991) (holding that “clearly established” law for deciding qualified immunity in this circuit consists of effective decisions at the time of the challenged conduct by the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest state court in the state where the case originated); accord Hamilton ex rel. Hamilton v. Cannon, 80 F.3d 1525, 1532 n. 7 (11th Cir.1996); Haygood v. Johnson, 70 F.3d 92, 95 (11th Cir.1995) (per curiam); D’Aguanno v. Gallagher, 50 F.3d 877, 881 n. 6 (11th Cir.1995).
Whatever bolstering of its decision the majority seeks to accomplish by the repetition of dicta in Justice v. City of Peachtree City, 961 F.2d 188 (11th Cir.1992), decided on May 14, 1992, is inappropriate. See Majority at 1044, 1046-47 n. 20. Not only did that ease involve the lawful, custodial strip search of a female high school student upon reasonable suspicion that she possessed contraband, but also Justice could not have been clearly established law for the subject strip searches of these second-graders that occurred thirteen days earlier. Equally inapplicable under our circuit definition of clearly established law as to the date of the questioned conduct is nonbinding case law of other federal circuit and district courts. Cf. id. at 1043 (“If the facts of other cases applying the balancing test or the test itself leads to such an ‘inevitable conclusion,’ then the ‘bright-line’ has been drawn.”); see id. at 1047 & n. 21.
I agree that, for preexisting law to establish that a particular act is unlawful, it is not essential that the facts of the earlier case be identical to the facts surrounding the conduct that is being challenged as unlawful. For example, if a precedent holds that, under certain circumstances, it is unlawfully cruel to cut off two fingers, that precedent clearly would establish that it would be unlawful to cut off three fingers under the same circumstances. This case, however, has nothing to do with that kind of case law.[5] In this case, no precedent is factually close enough to have given much guidance to these schoolteachers under the circumstances. Sitting en banc, we have said — over Judge Kravitch’s dissents — that public officials need not be able to draw analogies from earlier cases to avoid personal liability for damages. Lassiter, 28 F.3d at 1150; Adams, 998 F.2d at 923. For elementary schoolteachers to be competent in their jobs, it is not yet required that they think like a constitutional lawyer, much less like an activist one. Moreover, we have said repeatedly en bane — again in the face of Judge Kravitch’s dissents — that the cases serving as precedent, those that supposedly established the law applicable to the circumstances in which a defendant public official found himself, must be materially similar factually to the circumstances confronting the defendant public official if that earlier case law is to guide public officials sufficiently to place them in jeopardy of losing immunity. See Lassiter, 28 F.3d at 1149-51; Adams, 998 F.2d at 923.
No decision cited by the majority provides adequate precedent as clearly established law to guide the conduct of the schoolteachers in this case. Unlike many cases cited by the majority to support its decision, this case does not involve police officers or law enforcement personnel. This ease is about schools. Significantly, it concerns a specific type of school, an elementary school.
A high school and an elementary school are materially different places. The children in an elementary school are considerably younger and less mature, including less physically mature, than high school students. In elementary schools, the relationship between the teacher and students, who are young children, is much closer to that of parent and child than in high schools, where the students are approaching adulthood. In the first two or three grades in elementary *1051 school, the notion of in loco parentis, where teachers stand in the place of parents, has real meaning and a long and venerable tradition.[6] For example, many a young schoolchild properly has been helped to change clothes, consisting of putting on or taking off clothes, by a schoolteacher.
The Supreme Court’s T.L.O. decision involved a teenage high school student, obvious violation of the established school rule against smoking, and a consequent purse search revealing contraband. These facts materially distinguish T.L.O. from this case. The Supreme Court’s opinion in T.L.O. was written against the background of the facts before it. While T.L.O. contains some general language to guide trial courts faced with searches by school employees, that standard is a broadly composed one: basically, it is a reasonableness test. The “reasonableness, under all the circumstances” rule in T.L.O. gives little practical guidance to teachers facing facts unlike those in T.L.O. T.L.O., 469 U.S. at 341, 105 S.Ct. at 742. As we explained en banc in Lassiter, an abstract standard is insufficient guidance until trial courts have demonstrated its application in various factual situations. Lassiter, 28 F.3d at 1150.
The facts of T.L.O. are too different from this case to have dictated to reasonable elementary schoolteachers that the searches conducted already had been clearly established as unlawful. This conclusion, that is, that preexisting law did not dictate to reasonable teachers that their conduct in this case was unconstitutional, seems particularly strong upon consideration that the Supreme Court, aside from college and university cases, has never held any search based on individualized suspicions of a student by schoolteachers, including the T.L.O. search, to be unlawful under federal law, and neither have we or the former Fifth Circuit. Consequently, no bright lines had been delineated to help the teachers in this case to know what to do.[7]
While I agree that, for preexisting law to dictate a result in a particular case, the facts need not be exactly the same, they must be considerably closer than the analogies that the majority uses. Clearly established, preexisting law is a pragmatic concept, which the Supreme Court has stressed repeatedly. In my judgment, clearly established law means what it says, and our circuit cases teach that it means more than the majority of this panel seems to think that it means.
In conducting the challenged searches in this case, the schoolteachers might not have exercised good judgment or done what was right, but that is a very different concept from concluding that they violated clearly established federal law. The schoolteachers’ searches at issue in this case even may have violated the Fourth Amendment, but that conclusion is not unquestionably clear to me under our present circuit law.[8] It does seem *1052 plain to me, given T.L.O.’s sliding scale of reasonableness in view of all of the circumstances and the specific situation confronting the school personnel in this case, that by no means was it already clearly established when the school personnel acted that their conduct was unlawful. To say otherwise, I respectfully submit, is to demote a common sense safeguard — clearly established law — to a legal fiction.
While explaining its decision, the majority has written many statements that conflict with the law of this circuit, as I understand it. I am not going to bicker, however. Whatever our precedents say, they speak for themselves. Looking chiefly at Lassiter, the district judge believed that the law of this circuit required him to grant qualified immunity. I think that the judge was right, and I would affirm the district court’s judgment.
Before HATCHETT, Chief Judge, and TJOFLAT, KRAVITCH, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges.
Oct. 16, 1996
BY THE COURT:
A member of this court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges of this court in active service having voted in favor of granting a rehearing en banc,
IT IS ORDERED that the above cause shall be reheard by this court en banc. The previous panel’s opinion is hereby VACATED.

. The "special characteristics of elementary and secondary schools ... make it unnecessary to afford students the same constitutional protections granted adults and juveniles in a nonschool setting.” New Jersey v. T.L.O., 469 U.S. 325, 348, 105 S.Ct. 733, 746, 83 L.Ed.2d 720 (1985) (Powell, J., concurring). Because of their close association with each other and the necessary familiarity of teachers with students and authority over them, such schoolchildren "have a lesser expectation of privacy than members of the population generally.” Id. The Supreme Court has stated that the T.L.O. decision determined that the "State's power over schoolchildren is formally no more than the delegated power of their parents, ... but indeed emphasized, that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.” Vernonia School Dist. 47J v. Acton, - U.S. -, -, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995) (upholding urinalysis drug testing for grade and high school students participating in athletic programs, including reasoning that public school children are required to have vaccinations and physical examinations).

. The record reveals at least two incidents at Graham Elementary School prior to the searches challenged in this case where students, suspected of stealing money, were required to remove their shoes and socks with the result that the money was found. One involved a black, male student accused of stealing $5; the principal had him remove his shoes and socks and located the money. Another instance concerned a white, male student accused of stealing $.50; the missing change was discovered when the student was asked to remove his shoes and socks. The record also includes evidence of a search for a missing calculator where a number of students, both black and white, were instructed to remove their jackets so that their pockets could be searched. Additionally, there were incidents of students removing shoes and socks, untucking and shaking their shirts, unzipping their pants, and one student stripping entirely in the presence of school officials, a police officer, and his mother to search for contraband. Given this background of previously locating stolen money in students’ attire pursuant to varying degrees of supervised undress and, particularly, the location of stolen money after having suspected students remove their shoes and socks, the challenged searches conducted by the schoolteachers in this case were not totally unprecedented, as the majority suggests. Majority at 1045 n. 19; see Driscoll, 82 F.3d at 388 (finding that T.L.O. held that "school officials need only ‘reasonable grounds for suspecting’ that a search will turn up evidence that the student has violated either the law or school rules” (quoting T.L.O., 469 U.S. at 342, 105 S.Ct. at 743)); Alabama Student Party v. *1049 Student Gov't Ass’n of the Univ. of Alabama, 867 F.2d 1344, 1346 (11th Cir.1989) (acknowledging that T.L.O. requires easing of the restrictions generally applicable to the Fourth Amendment in a school context); see also Lenz v. Winburn, 51 F.3d 1540, 1551 (11th Cir.1995) (recognizing that the reasonableness or unreasonableness of a search under the Fourth Amendment is determined on a case-by-case basis (citing T.L.O., 469 U.S. at 337, 105 S.Ct. at 740)).

. "The qualified immunity standard 'gives ample room for mistaken judgments’ by protecting 'all but the plainly incompetent or those who knowingly violate the law.’ ” Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 1096, 1097, 89 L.Ed.2d 271 (1986)).

. The majority appears to be "interested in the state of the law at the time of the alleged uncon *1050 stitutional conduct, May 1, 1992.” Majority at 1043 n. 13. Yet, the majority concedes that “this circuit, before May 1, 1992, had not had the opportunity to apply T.L.O.'s standards in factually similar circumstances,” id. at 1043, and that "no case involving a student strip search had been presented to this court before the incidents in this case occurred,” id. at 1046-47 n. 20.

. The majority observes that some conduct is so egregious that no case needs to have recognized previously that such conduct violates federal law. Majority at 1041 n. 9. Accepting this idea in principle, I am comfortable in saying that I think we face in this case no great act of pure evil (such as, to use the majority’s example, slavery), that might trigger this rare and narrow exception to the extremely broad rule.

. The Court has recognized that “school authorities act[] in loco parentis." Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 684, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986).
Whether it should or should not do so, the American community calls upon its schools to, in substance, stand in loco parentis to its children for many hours of each school week.
Citizens expect and demand that their children be physically safe in the schools to whose supervision they are consigned, and the citizenry is outraged if the schools are less than safe and orderly.
Ferrell v. Dallas Indep. School Dist., 392 F.2d 697, 704 (5th Cir.) (Godbold, J., concurring), cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

. Clearly, the facts and law in this case do not support the majority’s conclusion that the elementary schoolteachers were not entitled to qualified immunity because their challenged searches were “in blatant disregard of the Fourth Amendment.” Majority at 1048.

.Theft of money is hardly a trivial matter, and there was cause for suspicion in this case. Nevertheless, the schoolteachers and the students were female, and the search was done in a relatively private place, the girls' restroom. I hasten to emphasize that conduct that may be constitutional also may be repugnant, ill-advised, and even outrageous. The strip searches in this case may have been offensive, but they did not violate clearly established constitutional law, when they occurred.
The thrust of the majority’s opinion seems to be an effort to diminish the importance of this court’s en banc decision in Lassiter. I cannot agree with this construction of a guiding circuit precedent. Inherently, en banc decisions are extremely important. This court does not go en banc casually. We do so "(1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance.” Fed.R.App.P. 35(a). I believe that Lassiter went en banc on both grounds.
*1052 The majority stresses that Lassiter represented no "sea change” in the law of qualified immunity. Majority at 1040. That statement is absolutely correct because the great majority of the judges of this circuit regularly were applying the principles set forth in Lassiter before Lassiter was published. See Lassiter, 28 F.3d at 1149 ("No new rules need to be announced to decide this case. But, for emphasis, we restate principles which do govern qualified immunity cases.”). A few judges of this court, however, were taking a significantly different approach to qualified immunity, an approach which was manifestly more hostile to public official defendants. In this sense, Lassiter marks a substantial change for those judges who thought that, and acted as if, the law was something different from the law that Lassiter reiterates.
Lassiter seems particularly important when one realizes that this court had made a previous en banc effort to declare the law of the circuit not long before. Adams, 998 F.2d at 923. Informed observers refer to Lassiter as Adams II. When Adams proved ineffective to secure uniformity, the court promptly went en banc again and rendered Lassiter with its stronger and more definitive statements. In my view, Lassiter is the law.