United States Court of Appeals,

Eleventh Circuit.

No. 95-6243.

Cassandra JENKINS, a minor, by her mother and next friend, Sandra HALL;  Onieka McKenzie, a minor, by her mother and next friend, Elizabeth McKenzie, Plaintiffs-Appellants,

v.

TALLADEGA CITY BOARD OF EDUCATION;  Susannah Herring, individually and in her capacity as a teacher of Graham Elementary School;  Melba Sirmon, individually and in her capacity as counselor at Graham Elementary School, Defendants-Appellees,

Charles Kurley, in his official capacity as Superintendent of the Talladega City School District, et al., Defendants.

Sept. 23, 1996.

Appeal from the United States District Court for the Northern District of Alabama. (No. 94-PT-739-E), Robert B. Propst, Judge.

Before KRAVITCH and BIRCH, Circuit Judges, and SCHWARZER[*], Senior District Judge.

KRAVITCH, Circuit Judge:

This action was brought on behalf of two elementary school students who allegedly were strip searched by a teacher and guidance counselor after having been accused of stealing money from a classmate.  The district court concluded that defendants were entitled to summary judgment on all claims.  In particular, the court granted the individual defendants summary judgment on plaintiffs' § 1983 Fourth Amendment claims.  We affirm all of the district court's summary judgment orders, except for the grant of qualified immunity to defendants on the Fourth Amendment claims, which we reverse.

---

[*]Honorable William W. Schwarzer, Senior U.S. District Judge for the Northern District of California, sitting by designation.

I.

In 1992, Cassandra Jenkins and Onieka McKenzie were eight-year-old second graders at Graham Elementary School in Talladega, Alabama. On the afternoon of May 1, one of Cassandra's and Onieka's classmates told their teacher, Hilda Fannin, that $7 was missing from her purse. Another classmate told Fannin that Cassandra had taken the money and stashed it in Onieka's backpack. After searching the backpack and finding no money, Fannin questioned Cassandra and Onieka in the hallway outside the classroom. The girls accused each other, as well as a male classmate, Anthony Jemison, of the theft.

As Fannin's questioning of Cassandra, Onieka, and Anthony continued in the hallway, the school music teacher, Susannah Herring, approached. Upon being informed of the theft accusation, Herring took charge of the investigation. First, she instructed the three students to take off their shoes and socks. No money was revealed. Herring then summoned Melba Sirmon, a guidance counselor whose office was nearby. Herring and Sirmon took Cassandra and Onieka to the girls' restroom.

Inside the restroom, Herring told Cassandra and Onieka to "check" their clothes for the money. According to Cassandra, Herring ordered them to go inside the stalls and come back out with their underpants down to their ankles.[1] As Cassandra and Onieka entered separate stalls and locked the doors, Sirmon left the restroom to check on Anthony, who was waiting outside. Shortly

_____

[1]Herring claims that she merely told Cassandra and Onieka to "check" their clothes, not to remove them.

after she returned, according to Cassandra, Cassandra and Onieka emerged from the stalls with their underpants pulled down to their ankles. Herring asked them if they had found the money, and they replied that they had not. Sirmon allowed them to return to their stalls and pull their underpants back up.[2]

Herring and Sirmon then escorted Cassandra, Onieka, and Anthony to the office of the school principal, Crawford Nelson. After hearing Herring's account of what had happened,[3] Nelson interrogated the three children about the location of the stolen cash. Anthony claimed that the money was hidden behind a file cabinet and then, when nothing was found there, that it was stashed in a locker. Nelson concluded that Anthony had no idea where the money was and dismissed him.

From Nelson's office, Herring and Sirmon took Cassandra and Onieka back to the restroom.[4] Inside, Herring ordered the two girls to take off their dresses, which they did. Cassandra was wearing a slip; Onieka was wearing only underpants. Herring then instructed them to shake their dresses, and she shook the slip Cassandra was wearing. After nothing was found, Cassandra and

---

[2] Onieka testified that she and Cassandra pulled their underpants down and back up while inside the locked stalls and that neither came out of the stalls with her underpants down.

[3] Although Herring apparently did not inform Nelson that Cassandra and Onieka had removed their clothes in the restroom, Nelson testified that he expressed disapproval of her forcing the girls to remove their shoes and socks.

[4] Herring and Sirmon assert that they only took Cassandra and Onieka to the restroom once, before they met with Nelson; thus, they dispute the girls' description of the second restroom incident in its entirety. There is no evidence that Nelson authorized or was aware of a second restroom trip.

Onieka were allowed to put their dresses back on.  This account was corroborated by a witness.  Joyce Merritt Shears, the parent of another student, was walking in the hallway past the girls' restroom while Cassandra and Onieka were being searched.  Shears heard children crying and an adult say either "remove your slip" or "hold up your slip."  Entering the restroom to investigate, Shears saw Cassandra and Onieka, "one in their panties and the other one in their slip."

The Talladega City Board of Education ("Board") conducted an investigation of the strip search.  After a hearing, the Board concluded that Herring had committed a "gross error in judgment" regarding the manner in which she investigated the alleged theft; that Sirmon had erred in her judgment by assisting Herring, failing to notify the principal immediately, and not calling Cassandra's and Onieka's parents;  and that Nelson had erred in his judgment by not calling the girls' parents and failing to establish a uniform policy for dealing with theft in the school.  Despite the superintendent's recommendation that Herring be fired, the Board did not impose any serious sanctions.

Plaintiffs, on behalf of Cassandra and Onieka, filed a complaint against the Board and nine individual defendants (including Nelson, Herring, and Sirmon) in 1994, alleging, pursuant to 42 U.S.C. § 1983, that they had been strip searched in violation of the Fourth Amendment, Title VI of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972, [5] and also

_____

[5]Cassandra and Onieka, who are black, claim that the searches conducted by Herring and Sirmon, who are white, were discriminatory based on race and gender.  With respect to gender,

alleging violations of Alabama tort law.  The district court initially dismissed all claims for money damages against all defendants, except for those against Herring and Sirmon in their individual capacities and those against the Board.  Then, on its own initiative, the court entered an order stating that it was reconsidering whether Herring and Sirmon were entitled to qualified immunity for the allegedly unconstitutional search in light of recent Eleventh Circuit decisions.  The court proceeded to grant summary judgment on the basis of qualified immunity in favor of the individual defendants on the Fourth Amendment claim.  In addition, the court granted summary judgment for all defendants on the Title VI and Title IX claims, finding no substantial evidence of discrimination based on race or gender;  for the Board on the § 1983 Fourth Amendment claim, finding no basis for municipal liability;  for all defendants on the claims for injunctive and declaratory relief, finding that the plaintiffs lacked standing to bring these claims;  and for individual defendants on the state law claims, finding that the defendants were entitled to qualified immunity under Article I, § 14 of the Alabama Constitution. Plaintiffs now appeal.

## II.

We affirm the grant of summary judgment for all defendants on

plaintiffs observe that Anthony Jemison was not strip searched despite also being accused of the theft.  With respect to race, they point to other searches in Talladega schools that, they allege, demonstrate a correlation between the intrusiveness of the searches and the race of the students searched.  After carefully reviewing the record, we agree with the district court that the plaintiffs have failed to present sufficient evidence of discrimination based on gender or race to survive the summary judgment motion.

the Title VI and Title IX claims, for the Board on the Fourth Amendment § 1983 claim, for all defendants on the claims for injunctive and declaratory relief, and for the individual defendants on the state law claims.[6] This leaves the issue of § 1983 qualified immunity for the individual defendants on plaintiffs' Fourth Amendment claims.

The district court granted Herring and Sirmon qualified immunity, concluding that Fourth Amendment law was not "clearly established" as applied to their conduct.[7] We reverse the district court's decision because Fourth Amendment law was sufficiently clear in 1992 that there could be no doubt that Herring's and Sirmon's actions (construing the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiffs at the summary judgment stage) were unconstitutional.

### III.

Before reaching the merits, we wish to clarify some general qualified immunity issues that seem to have confused the district

---

[6]Although we do not adopt the district court's thorough memorandum opinions on these issues as part of the opinion of this court, we generally find the court's analysis cogent and persuasive. Plaintiffs' contentions on appeal regarding these issues lack merit.

[7]The district court also granted qualified immunity to Nelson. On appeal, plaintiffs seem to argue that Nelson should be stripped of immunity because he violated clearly established law by failing to train teachers in proper search methods. This argument confuses individual liability for a constitutional violation with municipal liability under § 1983. Plaintiffs do not appear to claim that Nelson's alleged failure to train teachers amounts to an independent constitutional violation for which he could potentially be held liable in his individual capacity. Thus, the issue of qualified immunity should not even arise with respect to Nelson. We affirm the district court's grant of summary judgment in favor of Nelson.

court and defendants in this case.

The Supreme Court's qualified immunity doctrine attempts to strike a balance between two competing concerns: the necessity for constitutional damages actions against public officials because such actions "may offer the only realistic avenue for vindication of constitutional guarantees" and the need to limit the costs to individuals and society created by litigation against public officials—including diversion of official energies from pressing public issues, deterrence of able citizens from acceptance of public office, and "the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' " *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (quoting *Gregoire v. Biddle,* 177 F.2d 579, 582 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)).

In its effort to strike the optimal balance, the Supreme Court in *Harlow v. Fitzgerald* established an objective test for qualified immunity: government officials performing discretionary functions are immune from § 1983 liability for monetary damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 817-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In *Anderson v. Creighton,* the Court explained when a right is "clearly established":

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very

> action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).

These standards allow us to filter out the most culpable or least competent public officials and make them liable for damages, thereby striking the balance sought in *Harlow* by permitting the vast majority of government to operate free from panoptic judicial oversight or constitutional job descriptions while still retaining a viable avenue for vindication of constitutional guarantees.

Since *Anderson,* this court has devoted much effort to staking out an operational standard somewhere between the *Anderson* Court's polar extremes:  "in light of pre-existing law the unlawfulness must be apparent," but "the very action in question [need not have] previously been held unlawful."  Over-emphasizing either of the *Anderson* poles flouts the Supreme Court's efforts to construct a meaningful doctrine of *qualified* immunity.  To treat each set of facts as unique and legally indeterminate would make qualified immunity absolute by denying that any unlawful conduct violates rights that were "clearly established."  At the other extreme, relying on abstract, highly general formulations of rights would effectively abrogate immunity by declaring every violated right "clearly established."  After *Anderson,* then, this court has sought a stable equilibrium between these opposing pressures.

Although there is no doubt that qualified immunity law in this circuit has evolved in its application to some extent in the direction of more protection for government officials, this has

simply been the result of implementing the *Anderson* Court's clarification of the appropriate level of generality at which a right must be "clearly established" for purposes of qualified immunity. *See Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) ("The most common error we encounter ... occurs on this point: courts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract "rights.' ") (citing *Anderson,* 483 U.S. at 637-41, 107 S.Ct. at 3038-39).

Some of our efforts, however, have been misinterpreted as a sea change in qualified immunity. For instance, the district court in this case originally concluded that Sirmon's and Herring's actions did violate clearly established Fourth Amendment law, but it felt obligated to reconsider *sua sponte* based on its reading of some recent Eleventh Circuit qualified immunity cases. *See, e.g., Lassiter,* 28 F.3d 1146.[8]

Notwithstanding *Lassiter* 's admonition that the court was announcing no "[n]ew rules," but merely "for emphasis ... restat[ing] principles which do govern qualified immunity cases," 28 F.3d at 1149, that opinion has been misconstrued as announcing a sweeping change. For instance, the statement in *Lassiter* that "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated,

_____

[8]In addition to *Lassiter,* the district court cited *Spivey v. Elliott,* 41 F.3d 1497 (11th Cir.1995); *Belcher v. City of Foley,* 30 F.3d 1390 (11th Cir.1994); and *Post v. City of Ft. Lauderdale,* 7 F.3d 1552 (11th Cir.1993), *modified,* 14 F.3d 583 (11th Cir.1994).

reasonable government agent that what defendant is doing violates federal law *in the circumstances*," *Lassiter,* 28 F.3d at 1150, has been read by some to indicate that qualified immunity is due every official unless this court has addressed essentially identical facts in a previous case. But *Lassiter* merely rephrases the *Anderson* standard, "in the light of pre-existing law the unlawfulness must be apparent." *Lassiter* does not abrogate *Anderson* 's recognition that "the very action in question [need not have] previously been held unlawful" nor could it have.

Likewise, other cases have been misconstrued. We can all agree that "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant," *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993), *modified,* 14 F.3d 583 (11th Cir.1994). This is another restatement of the *Anderson* requirement that the law must be apparent, but it does not answer the question "how bright?" or define the set of cases gestured towards by "almost." In other words, these recent cases have not eviscerated *Anderson* 's recognition that "the very action in question [need not have] previously been held unlawful." Thus, the basic principles of qualified immunity doctrine remain unchanged.

The confusion over qualified immunity is exemplified by defendants' apparent assumption that relevant law can be "clearly established" only when there exist cases with facts materially similar to those of the case at hand, as evidenced by their insistence that qualified immunity is due here because this court has never addressed a factually similar case. This argument is

false in at least two circumstances: those in which the official misconduct is more egregious than conduct of the same general type that has been deemed illegal in other cases[9] and those rare cases in which application of the legal standard would necessarily lead reasonable officials in the defendant's situation to but one inevitable conclusion. It is the latter we are most interested in here.

*Lassiter* explicitly left "open the possibility that occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law." *Lassiter,* 28 F.3d at 1150 n. 4. It, of course, follows that if a federal statute or federal constitutional provision can clearly establish the law in the absence of case law, the Supreme Court's

---

[9]*See Dolihite v. Maughon,* 74 F.3d 1027, 1048 (11th Cir.1996) (examining the facts to determine whether or not the act alleged in that case was "as egregious as [previous] cases, or more so"). In other words, if cases make clear that conduct *x* is constitutionally or statutorily forbidden, then the law is certainly "clearly established" with respect to conduct *y* if *y* is worse than *x* relative to the reason *x* is unconstitutional or otherwise illegal. And this is so even if—or especially if—the facts of *y* differ considerably from the facts of *x:*

> It begins to seem as if to survive a motion to dismiss a suit on grounds of immunity the plaintiff must be able to point to a previous case that differs only trivially from his case. But this cannot be right. The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

*K.H. v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990).

pronouncement of a constitutional test could also be specific enough to do so.

That the law can be clearly established where the application of a constitutional standard leads to an inevitable conclusion that the acts are unconstitutional should be obvious given the purposes of qualified immunity. If a government official with even the most rudimentary, not to say reasonable, understanding of relevant law would have no doubt that his conduct was unconstitutional or otherwise illegal, then it would be perverse to immunize him from liability simply because his behavior was more egregious than any on record or because this court never before faced a similar set of facts.

Our circuit recently applied this very reasoning. In *McMillian v. Johnson,* 88 F.3d 1554 (11th Cir.1996), the plaintiff contended that, by placing him on deathrow while he awaited trial, local officials had violated his due process right to be free from punishment as a pretrial detainee. The lack of cases with materially similar facts did not preclude the *McMillian* court from denying summary judgment to the defendants on qualified immunity grounds. The court found that the Supreme Court's constitutional directive as set forth in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)—that officials cannot impose conditions on pretrial detainees with an intent to punish—would have put any reasonable official on notice that the acts alleged in *McMillian* violated clearly established law:

> [F]or the law to be clearly established, a court need not have found the very action in question unlawful; what is essential is that the action's unlawfulness be apparent in light of pre-existing law. *Jordan [v. Doe* ], 38 F.3d [1559,] 1566 [

(11th Cir.1994) ].  We do not view the absence of a case factually similar to the extraordinary allegations in this case as an indication that the law was not clearly established that confining a pretrial detainee on death row to punish him is unconstitutional.  *Bell's prohibition on any pretrial punishment, defined to include conditions imposed with an intent to punish, should have made it obvious to all reasonable officials in [defendants'] place that holding [plaintiff] on death row to punish him before he was tried violated [his] due process rights.*

*McMillian,* 88 F.3d at 1565 (emphasis added).  Thus, *McMillian* held that, at least for purposes of the case before it, the *Bell* rule clearly established the law.

Defendants next argue that even if a constitutional standard might clearly establish the law in some circumstances, the relevant law can virtually never be clearly established by cases that employ balancing tests.  (*New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the case governing application of the Fourth Amendment to school searches, uses a balancing test.)  The premise appears to be that balancing tests, by their nature, do not stake out a bright enough line to put public officials on notice of when their conduct violates a constitutional right.

The defendants' premise is flawed.  It is indisputable that cases applying the balancing test may well make its application to allegedly unconstitutional conduct entirely determinate.[10]  Thus,

[10]As *Lassiter* reiterated:

"If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993), *modified,* 14 F.3d 583 (11th Cir.1994); *accord Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994).  "The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances." *Barts* [*v. Joyner* ], 865 F.2d [1187,]

there never has been any doubt that public officials can be stripped of qualified immunity when, for instance, they conduct a warrantless search that could not reasonably be thought supported by probable cause or exigent circumstances.[11] And, although it is true that the mere statement of a balancing test (or other flexible legal standard) will usually be insufficient to determine whether particular conduct is clearly illegal, such a test, like other legal standards or statutes, may be sufficient to clearly establish the law in some, albeit rare, circumstances. *See Oladeinde v. City of Birmingham,* 963 F.2d 1481, 1487 (11th Cir.1992) (concluding, without citing a materially similar case, that application of the balancing test in that case would lead to the "inevitable conclusion" that defendants violated the Constitution) (Edmondson, J.), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153

1194 [ (11th Cir.1989), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989) ].

*Lassiter,* 28 F.3d at 1150.

[11]*See, e.g., Anderson,* 483 U.S. at 635, 107 S.Ct. at 3034 (assuming this to be true while emphasizing that the converse is also true); *Williamson v. Mills,* 65 F.3d 155, 157-58 (11th Cir.1995) (no qualified immunity for police officer on Fourth Amendment false arrest claim where "pre-existing law compels the conclusion" that officer lacked "even arguable probable cause"); *Hartsfield v. Lemacks,* 50 F.3d 950, 955 (11th Cir.1995) (no qualified immunity for police officer who failed to make reasonable effort to identify residence to be searched where "all reasonable police officers should have known" that this violated the law); *Swint v. City of Wadley,* 51 F.3d 988, 996-1000 (11th Cir.1995) (no qualified immunity for police officers who conducted warrantless searches and seizures without, in light of the facts of analogous Fourth Amendment cases, "even arguable probable cause"); *Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990) ("[A]pplying the qualified immunity test in the context of Plaintiff's alleged unlawful arrest, we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff....").

(1993).

It is, therefore, misleading to speak of a separate category of cases in which there is no "bright-line" rule that "puts the reasonable public [official] on notice of a constitutional violation," but in which the official is nonetheless not entitled to qualified immunity when application of a balancing test "would lead to the inevitable conclusion" that the official's conduct was unconstitutional. *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989) (acknowledging a balancing test will lead to the inevitable conclusion that a defendant's conduct violated clearly established law in some cases). If the facts of other cases applying the balancing test or the test itself leads to such an "inevitable conclusion," then the "bright-line" has been drawn.

IV.

The qualified immunity question presented by this case is whether Fourth Amendment law "clearly established" that the search of Cassandra and Onieka conducted by Herring and Sirmon was unconstitutional.[12] The application of the Fourth Amendment to searches of public school students is[13] governed by *New Jersey v.*

---

[12]*Harlow* requires that the defendant official prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," before the burden of proof shifts to the plaintiff to demonstrate that the defendant violated clearly established law. *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983). Plaintiffs in this case concede that Herring and Sirmon were acting within the scope of their discretionary authority at the time of the search.

[13]Although we use the present tense here, our analysis of the relevant law is historical: we are interested in the state of the law at the time of the alleged unconstitutional conduct, May 1, 1992.

*T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). T.L.O., a 14-year-old high school student, was spotted by a teacher smoking in the bathroom. When questioned by a school administrator, T.L.O. denied smoking in the bathroom and claimed that she did not smoke at all. The administrator demanded and opened T.L.O.'s purse, discovering a pack of cigarettes. Reaching into the purse for the cigarettes, the administrator noticed a package of rolling papers. The administrator, suspecting that further evidence of drug use might be found, proceeded to search the purse thoroughly, revealing marijuana and various implements of dealing the drug. 469 U.S. at 325-36, 105 S.Ct. at 735-36.

After deciding that the Fourth Amendment applies to searches of public school students, the Court held that the search of T.L.O.'s purse was not unreasonable. Balancing "the child's interest in privacy" against "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds," *id.* at 338-39, 105 S.Ct. at 741, the Court concluded that the reasonableness of a school search was determined by a two-part inquiry—whether it was (1) justified at its inception and (2) permissible in scope—with no requirement of probable cause. *Id.* at 339-43, 105 S.Ct. at 742-43. In particular, the Court specified the following standards:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341-42, 105 S.Ct. at 743.

We apply these precepts to the case at hand. In doing so, we note that this circuit, before May 1, 1992, had not had the opportunity to apply *T.L.O.*'s standards in factually similar circumstances. The lack of Eleventh Circuit case law does not, however, preclude us from determining whether the Supreme Court's directive itself would have led reasonable school officials to the inevitable conclusion that their behavior violated the Constitution.

We will assume that the searches of Cassandra and Onieka in this case comprised a single, step-by-step search that was justified at its inception.[14] For the purposes of this case, we will assume that their classmate's accusation may have provided "reasonable grounds" for searching Onieka's backpack and, perhaps, even for requiring the children to remove their shoes and socks. We will also assume that these first stages of the overall search were reasonable in scope. It is the following stages, the restroom searches, and their expansion in scope that create the glaring problem.

Under *T.L.O.,* the two restroom searches in which Cassandra and

---

[14]Alternatively, we could conceptualize what occurred as a series of separate searches, each requiring independent justification at its inception. *Cf. T.L.O.,* 469 U.S. at 341-49, 105 S.Ct. at 743-46 (Court treated the initial investigation of T.L.O.'s purse for cigarettes and the continued investigation after rolling papers were spotted as separate searches, concluding that each was justified at its inception). As indicated by our discussion later in the text where we address whether the search was reasonable in scope, the two restroom searches probably were not justified at their inceptions. We choose not to rest our holding on this inquiry, however, because the more blatant injustice in this case is the ultimate scope of the search conducted by Herring and Sirmon.

Onieka were required to undress were unconstitutional unless they were " "reasonably related in scope to the circumstances which justified the interference in the first place.' " *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 743 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).  More specifically, in order for the scope of these searches to be permissible, "the measures adopted" must have been "reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. at 743.

Thus, *T.L.O.* requires us to consider several factors in determining whether the scope was permissible:  whether there was a reasonable relationship between the scope of the search (the measures adopted) and the objectives of the search;  the intrusiveness of the search in light of the age and sex of the student;  and the intrusiveness of the search in light of the nature of the infraction.

To determine whether the scope of a search is reasonably related to its objectives, we must examine the measures adopted here.  Strip searches are among the most intrusive of searches. [15] This fact is self-evident.  As this court, in the course of its most thorough consideration of the constitutionality of strip searching minors, has recognized:  "It is axiomatic that a strip

_____

[15]We recognize that some types of strip searches, such as body cavity searches, are even more intrusive than the search conducted in this case.  We also note that a strip search performed by someone of a different gender from the person searched will be considered significantly more intrusive than a same-sex search.

search represents a serious intrusion upon personal rights. In *Mary Beth G.* [*v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) ], the court referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.' " *Justice v. City of Peachtree City,* 961 F.2d 188, 192 (11th Cir.1992).[16] Moreover, the perceived invasiveness and physical intimidation intrinsic to strip searches may be exacerbated for children. *See Justice,* 961 F.2d at 192 ("[c]hildren are especially susceptible to possible traumas from strip searches") (internal quotation marks omitted). Consequently, for the extreme invasion of privacy inflicted by a strip search to be "reasonably related to the objectives of the search," these objectives must carry tremendous weight.[17]

---

[16]*Justice* was decided a few days after the events at issue here and, therefore, does not clearly establish the law in this case for qualified immunity purposes. We cite the case not as an illustration of clearly established law but as evidence that the point at issue here—that strip searches are inherently among the most intrusive of searches—is self-evident, as the *Justice* court itself concluded.

[17]*See Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1321 (7th Cir.1993) ("[A]s the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness. What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search.").

> *T.L.O.*'s sliding scale for reasonableness determinations is an inherent part of Fourth Amendment jurisprudence in those cases, like *T.L.O.,* where, although probable cause is not required, a "reasonableness" standard still applies. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742-43, cites *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* teaches that "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." 392 U.S. at 19, 88 S.Ct. at 1878 (citations and internal

We next look at the objectives of the search and whether they were reasonably related to the methods chosen, i.e., whether the search was " "reasonably related in scope to the circumstances which justified the interference in the first place.' " *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 743 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).[18]  In applying this rule in *Terry,* the Court determined whether the search was "confined in scope to an intrusion reasonably designed to discover" the items sought and "confined ... strictly to what was minimally necessary" to locate those items.  *Terry,* 392 U.S. at 29-30, 88 S.Ct. at 1884-85.

We must decide, therefore, whether the extreme intrusiveness involved in the strip searches here was "reasonably related" to the objective of discovering the allegedly stolen cash.  Because the possibility of finding the cash in the two restroom searches was slight (at best), we conclude that the extreme measures adopted here were not reasonably related to the objectives of the search.

A second-grader reported $7 missing.  Her teacher never asked her whether she might have lost the money or forgotten that she

_____

quotation marks omitted).  *See also, e.g., United States v. McMurray,* 747 F.2d 1417, 1420 (11th Cir.1984) (requiring, in the customs context, that as intrusiveness increases, the amount of suspicion necessary to justify the search must correspondingly increase).

[18]This standard also suggests that we look to the seriousness of the offense or the danger the search seeks to prevent to determine whether the methods were reasonably related to the objectives of the search.  For clarity's sake, we have confined these considerations to that part of our opinion discussing *T.L.O.*'s requirement that the search not be "excessively intrusive in light of the ... nature of the infraction."  469 U.S. at 342, 105 S.Ct. at 743.  *See* discussion *infra* and note 20.

spent it. Fannin simply asked another student whether she knew anything about the missing money. That student reported that Cassandra had taken the money and put it in Onieka's backpack. Fannin never asked that student how she knew, whether she had seen the event, or, if not, who told her about it. And there is no evidence that Onieka or Cassandra had stolen anything before. The failure to locate the money in Onieka's backpack, where it was reportedly stashed, casts further doubt on the reliability of the informant's story and, thus, the justification for the investigation. Furthermore, Fannin did not check Cassandra's bag or any other area of the room before handing the investigation over to Herring.

When Herring accepted responsibility for the investigation, she did not ask Fannin about any of the details, including who had originally accused the girls or how the accuser knew the girls had taken the money. All she knew was that the girls had been accused of taking $7 and that they, in turn, accused each other and Anthony Jemison of stealing the cash. With only this evidence in hand and without seeking any specifics from the children about the theft, she made the girls and Anthony remove their shoes and socks.[19] When the money was not found there, she proceeded, with Sirmon, to take the girls to the restroom to search them even though no one had reported that either of the girls had hidden the money in her underclothing and there was no evidence that the girls had ever hidden money or contraband in their clothing before. The entire

_____

[19]It is at least questionable whether Herring had reasonable grounds for requiring Cassandra and Onieka to remove their shoes and socks.

restroom search was apparently premised on the fact that one of the girls had been to the restroom before the money was reported missing. If this were the reason for concluding the money was hidden in one of the girl's underclothing, Sirmon and Herring might have had arguable, albeit slight, grounds for believing that a first search of that girl's underclothing would lead to evidence of the theft. There were no grounds, however, for taking both girls to the restroom.

After finding nothing in the girls' underpants during the first search, Sirmon and Herring took them to the restroom a second time. If the method chosen in the first restroom search was highly unlikely to lead to evidence, then requiring the girls to undress a second time was completely unlikely to end in discovery of the cash. Having looked in the girls' underpants, the probability that the money could have been hidden anywhere else on the children's persons (especially after a walk to and from the principal's office) was almost nil. Thus, even at this stage of the inquiry it is difficult to believe that any reasonable school official could surmise that it was constitutionally permissible to conduct these two highly intrusive searches where there was such a negligible possibility that any evidence of the infraction would be found. *T.L.O.,* however, gives us further guidance.

Under *T.L.O.,* the nature of the infraction is another factor to be weighed in determining the permissible intrusiveness or scope of a search. One can imagine the range of possible school-place infractions as a spectrum with the most serious infractions falling at one end. While reasonable school officials would disagree about

exactly where the infraction at issue here might fall along the spectrum, the following generalizations are certain. It is obvious that an infraction that presents an imminent threat of serious harm—for example, possession of weapons or other dangerous contraband—would be the most serious infractions in the school context.[20] Thus, these offenses would exist at one end of the

---

[20]In fact, strip searches are probably only permissible in the school setting, if permissible at all, where there is a threat of imminent, serious harm. Writing separately in *T.L.O.,* Justice Stevens made clear that the point of the majority's Fourth Amendment standard was to avoid litigation over the routine, limited searches necessary to maintain school discipline, while "prohibit[ing] obviously unreasonable intrusions of young adults' privacy." 469 U.S. at 381, 105 S.Ct. at 764. To illustrate the type of egregious school search that would noncontroversially violate the Fourth Amendment, Justice Stevens gave this example:

> One thing is clear under any standard—the shocking strip searches that are described in some cases have no place in the schoolhouse. *See Doe v. Renfrow,* 631 F.2d 91, 92-93 (CA7 1980) ("It does not require a constitutional scholar to conclude that a nude search of a 13-year-old child is an invasion of constitutional rights of some magnitude"), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981); *Bellnier v. Lund,* 438 F.Supp. 47 (NDNY 1977); *People v. D.,* 34 N.Y.2d 483, 358 N.Y.S.2d 403, 315 N.E.2d 466 (1974); *M.J. v. State,* 399 So.2d 996 (Fla.App.1981). To the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm.

*Id.* at 382 n. 25, 105 S.Ct. at 764 n. 25 (Stevens, J., concurring in part and dissenting in part).

Eleventh Circuit caselaw confirms Justice Stevens's understanding of the *T.L.O.* standard. Although no case involving a student strip search had been presented to this court before the incidents in this case occurred, less than two weeks after this case was decided, we took the opportunity to express our view of such searches. In *Justice,* this court held that law enforcement officials may subject a juvenile who is lawfully in custody to a limited strip search based upon reasonable suspicion that he or she is concealing a weapon or drugs. 961 F.2d at 193. In reaching this conclusion, however, the *Justice* court was

careful to emphasize the limited scope of its holding and to distinguish other situations in which a strip search would be unconstitutional.  Because the strip search in *Justice* was performed by law enforcement officers on a person lawfully in custody, the court considered itself bound by *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which had held that the unique security concerns of detention facilities could justify strip searches of pretrial detainees.  *Justice,* 961 F.2d at 193.  On the other hand, in stressing the intrusiveness of strip searches, the *Justice* court pointed to a context in which a strip search would certainly violate the Fourth Amendment:  when it is inflicted on a student in a situation that presents no danger of imminent and serious harm.

Picking up where Justice Stevens in *T.L.O.* left off, the *Justice* court favorably cited and discussed *Doe v. Renfrow,* 631 F.2d 91 (7th Cir.1980), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).  961 F.2d at 193.  The Seventh Circuit in *Doe* held that a strip search of a thirteen-year-old student by school officials without reasonable suspicion to believe she possessed drugs clearly violated the Fourth Amendment, foreclosing qualified immunity for the school officials.  *Justice* reaffirms and embraces this conclusion as obvious:

> [*Doe* held that] the strip search of a thirteen-year-old female without "reasonable cause" to believe she possessed contraband on her person constituted an "invasion of constitutional rights of some magnitude." *Doe,* 631 F.2d at 93.  The Seventh Circuit then stated[,] "More than that:  it is a violation of any known principle of human decency....  [T]he conduct herein described exceeded the "bounds of reason' by two and a half country miles." *Doe,* 631 F.2d at 93.

*Id.* (bracketed alterations added).

Although these cases strongly support our position, we do not rely on them in reaching our holding in this case.

Even courts determining the constitutionality of strip searches of post-arrest detainees have looked to the probability that the detainee possesses dangerous contraband.  *See, e.g., Masters v. Crouch,* 872 F.2d 1248, 1253-55 (6th Cir.) (strip search of person arrested for traffic violation or other minor offense not associated with violence unreasonable absent individualized reasonable suspicion that arrestee is carrying a weapon or contraband), *cert. denied,* 493 U.S. 977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989); *Jones v. Edwards,* 770 F.2d 739 (8th Cir.1985) (strip search of person arrested for refusing to sign

spectrum.  Thefts of valuable items or large sums of money would fall a little more toward the center of the spectrum.  Thefts of small sums of money or less valuable items and possession of minor, nondangerous contraband would fall toward the opposite extreme of the spectrum.  Such infractions would seldom, and probably never, justify the most intrusive searches.  It follows that the infraction at issue here, the theft of $7, while perhaps not a trespass to be taken lightly, is, nonetheless, an offense which would not justify a highly intrusive search, and certainly not where the likelihood of finding evidence of the offense was as weak as it was here.

*T.L.O.* also requires us to take the student's age into consideration.  The students in this case were extremely young, only second graders.  The Supreme Court did not elaborate on how we should consider age.  *See, e.g., Cornfield,* 991 F.2d at 1321 (discussing issue).  Nevertheless, regardless of a student's age, *T.L.O.* forbids school officials from undertaking the most intrusive of searches where the infraction is relatively minor and presents

---

summons regarding leash law violation unreasonable); *Stewart v. Lubbock County,* 767 F.2d 153 (5th Cir.1985) (strip searches of minor offenders awaiting bond unreasonable absent reasonable suspicion that they possess weapons or contraband), *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Mary Beth G. v. Chicago,* 723 F.2d 1263, 1268-73, 1273 (7th Cir.1983) ("[E]nsuring the security needs of the City by strip searching ... was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed."); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981) (strip search of arrested drunk driver unreasonable given that offense not associated with possession of weapons or contraband and no cause to believe that individual arrestee possessed either), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

no threat of imminent danger and where it is highly unlikely that the search will turn up evidence of the infraction. To conclude otherwise would be to read *T.L.O.* such that it does not protect elementary school students at all.

Considered together, the factors identified in *T.L.O.*—the glaring disproportion between the objectives of the searches and the measures adopted and the trivial nature of the infraction—point unequivocally to the unreasonableness of the two restroom searches at issue here. Even if the *T.L.O.* reasonableness standard is indeterminate for a broad category of school searches, it indisputably prohibits strip searches of students in this situation.[21] Sirmon and Herring, therefore, are not entitled to qualified immunity, because the *T.L.O.* standard would have led any reasonable school official in their circumstances to the inevitable conclusion that the conduct charged here violated the Constitution.

The line drawn in *T.L.O.* may not be bright enough to dictate the results of cases closer to the line, for example, cases in

---

[21]Although we do not depend on the case law of other circuits in reaching this holding, we note that other courts have reached the same conclusion. *See Tarter v. Raybuck,* 742 F.2d 977, 982 (6th Cir.1984) ("Thus, for example, the authority of the school official [to maintain school discipline and order] would not justify a degrading body cavity search of a youth in order to determine whether a student was in possession of contraband in violation of school rules."), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985); *Oliver v. McClung,* 919 F.Supp. 1206, 1216-19 (N.D.Ind.1995) (in light of *Doe v. Renfrow* and *T.L.O.,* law clearly established that strip search of seventh-grade girls seeking missing $4.50 violates Fourth Amendment); *Bellnier v. Lund,* 438 F.Supp. 47, 52-54, 54 (N.D.N.Y.1977) (strip searches of students in fifth grade class seeking missing $3 unreasonable "in view of the relatively slight danger of the conduct involved (as opposed to drug possession, for example), the extent of the search, and the age of the students involved").

which there is a reasonable suspicion that a student has hidden on his or her person drugs or weapons.[22] The facts presented at the summary judgment stage in the case now before us, however, are clearly far to the unconstitutional side of that line. Cassandra and Onieka were eight-year-old elementary school students. They were accused of stealing $7 that may or may not have been missing, solely on the basis of the accusation of a second-grade classmate; there was no evidence that they had ever before stolen money or hidden anything in their clothing. Even if the girls had possessed the cash (which they apparently did not), their infraction would have threatened no imminent or serious harm. Nevertheless, even after investigations of Onieka's backpack and both girls' shoes and socks had revealed no money and without making any further inquiries into the matter, Herring and Sirmon twice forced Cassandra and Onieka to undress and submit to inspection. Reasonable teachers or school officials in their positions could not have believed that the Fourth Amendment, in light of *T.L.O.*, would allow such a search. We conclude, based on the facts presented at the summary judgment stage, that Herring and Sirmon acted in blatant disregard of the Fourth Amendment. Consequently, they are not entitled to qualified immunity.

V.

---

[22]*See Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1320-23, 1320 (7th Cir.1993) (holding strip search of high school student based on reasonable suspicion that he possessed drugs does not violate Fourth Amendment, while making clear that a "a highly intrusive search in response to a minor infraction" would be unconstitutional under *T.L.O.*); *Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991) (granting qualified immunity to school officials who strip searched two high school students for drugs on at least reasonable suspicion).

The district court's orders granting summary judgment for defendants Herring and Sirmon on the basis of qualified immunity from plaintiffs' § 1983 Fourth Amendment claims are REVERSED. The district court's other summary judgment orders in this case are AFFIRMED.

BIRCH, Circuit Judge, dissenting:

I respectfully dissent. Although I am outraged by the conduct of the schoolteachers in this case and am convinced that they left their better judgment at home on May 1, 1992, I cannot conclude that these individuals understood or should have understood that the strip searches that they conducted were violative of the clearly established Fourth Amendment rights of these second-grade students. While it is easy to second-guess school personnel in a courthouse far removed from the tumult and tumble of the work-a-day world of the schoolhouse with the aid of twenty-twenty hindsight, the majority does a grave disservice to our law and to public servants in determining that these individuals violated the exceedingly limited constitutional rights of schoolchildren.[1]  *See*

---

[1]The "special characteristics of elementary and secondary schools ... make it unnecessary to afford students the same constitutional protections granted adults and juveniles in a nonschool setting." *New Jersey v. T.L.O.,* 469 U.S. 325, 348, 105 S.Ct. 733, 746, 83 L.Ed.2d 720 (1985) (Powell, J., concurring). Because of their close association with each other and the necessary familiarity of teachers with students and authority over them, such schoolchildren "have a lesser expectation of privacy than members of the population generally." *Id.* The Court has stated that the *T.L.O.* decision determined that the "State's power over schoolchildren is formally no more than the delegated power of their parents, ... but indeed emphasized, that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School Dist. 47J v. Acton,* --- U.S. ----, ----, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995) (upholding urinalysis drug testing for grade and high school

*C.B. ex rel. Breeding v. Driscoll,* 82 F.3d 383, 385 (11th Cir.1996). Furthermore, no policy had been formulated by the Talladega City Board of Education or the Graham Elementary School regarding student searches during the 1991-1992 school year. Stolen money previously had been recovered through searches of students' attire at Graham Elementary School.[2] Moreover, as the district judge ascertained, there was no binding, clearly

students participating in athletic programs, including reasoning that public school children are required to have vaccinations and physical examinations).

[2]The record reveals at least two incidents at Graham Elementary School prior to the searches challenged in this case where students, suspected of stealing money, were required to remove their shoes and socks with the result that the money was found. One involved a black, male student accused of stealing $5; the principal had him remove his shoes and socks and located the money. Another instance concerned a white, male student accused of stealing $.50; the missing change was discovered when the student was asked to remove his shoes and socks. The record also includes evidence of a search for a missing calculator where a number of students, both black and white, were instructed to remove their jackets so that their pockets could be searched. Additionally, there were incidents of students removing shoes and socks, untucking and shaking their shirts, unzipping their pants, and one student stripping entirely in the presence of school officials, a police officer, and his mother to search for contraband. Given this background of previously locating stolen money in students' attire pursuant to varying degrees of supervised undress and, particularly, the location of stolen money after having suspected students remove their shoes and socks, the challenged searches conducted by the schoolteachers in this case were not totally unprecedented, as the majority suggests. Majority at 3607 n. 19; *see Driscoll,* 82 F.3d at 388 (finding that *T.L.O.* held that "school officials need only "reasonable grounds for suspecting' that a search will turn up evidence that the student has violated either the law or school rules" (quoting *T.L.O.,* 469 U.S. at 342, 105 S.Ct. at 743)); *Alabama Student Party v. Student Gov't Ass'n of the Univ. of Alabama,* 867 F.2d 1344, 1346 (11th Cir.1989) (acknowledging that *T.L.O.* requires easing of the restrictions generally applicable to the Fourth Amendment in a school context); *see also Lenz v. Winburn,* 51 F.3d 1540, 1551 (11th Cir.1995) (recognizing that the reasonableness or unreasonableness of a search under the Fourth Amendment is determined on a case-by-case basis (citing *T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740)).

established law that these schoolteachers violated in conducting the challenged strip searches.

"For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a *concrete and factually defined context* to make it *obvious* to all reasonable government actors, in the defendant's place, that "what he is doing' violates federal law."[3] *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)) (emphasis added). The *Lassiter* court admonished that the facts of cases relied upon as precedent must be "materially similar"; "*[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.*" *Id.* at 1150 (quoting *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *adopted en banc,* 998 F.2d 923 (11th Cir.1993) (per curiam)) (alteration in original). If the standard for qualified immunity were whether preexisting law had established that the strip searches by the schoolteachers in this case, when they occurred, *might* have been unlawful under federal law, then the majority opinion *might* be correct. That standard, however,—the "it might be unlawful" standard—according to the Supreme Court and repeated decisions of this court is not the proper standard. *See*

---

[3]"The qualified immunity standard "gives ample room for mistaken judgments' by protecting "all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 1096, 1097, 89 L.Ed.2d 271 (1986)).

*Muhammad v. Wainwright,* 839 F.2d 1422, 1425 (11th Cir.1987) ("[A]t the relevant time, defendants, at best, had only some reason to suspect that their actions might be unlawful. Such a suspicion is inconsistent with the "clearly established' standard enunciated by *Harlow* [*v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ] and its progeny."); *see also Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984) ("[O]fficials should not err always on the side of caution."); *accord Lassiter,* 28 F.3d at 1149; *Lenz v. Winburn,* 51 F.3d 1540, 1551 (11th Cir.1995).

Indeterminacies, speculations, and predictions have no place in our qualified immunity law. Elementary schoolteachers, nonlawyers whose primary responsibilities are education and the daily administration of their classrooms, cannot be required to foresee how the Eleventh Circuit would apply Supreme Court precedent and decide this particular factual situation if presented. That would be not only an unprecedented but also an unreasonable standard. Accordingly, the majority's reliance on *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), involving the purse search of a high school student and the discovery of contraband, is misplaced because *T.L.O.* is not factually similar to the strip searches that we review and cannot be clearly established law to resolve this case, much less *dicta* in *T.L.O.*

Because of its "practical application," qualified immunity is judged by the conduct of government personnel *at the time that they acted,* "not by hindsight, based on later events." *Lassiter,* 28

F.3d at 1150; *see Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) ("[T]he court should ask whether the agents acted reasonably under *settled law in the circumstances,* not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." (emphasis added)). On May 1, 1992, the date of the strip searches at issue in this case, there was no clearly established law regarding the unconstitutionality of strip searches of schoolchildren from the Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court.[4] *See Courson v. McMillian,* 939 F.2d 1479, 1498 n. 32 (11th Cir.1991) (holding that "clearly established" law for deciding qualified immunity in this circuit consists of effective decisions at the time of the challenged conduct by the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest state court in the state where the case originated); *accord Hamilton ex rel. Hamilton v. Cannon,* 80 F.3d 1525, 1532 n. 7 (11th Cir.1996); *Haygood v. Johnson,* 70 F.3d 92, 95 (11th Cir.1995) (per curiam); *D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir.1995).

Whatever bolstering of its decision the majority seeks to accomplish by the repetition of *dicta* in *Justice v. City of Peachtree City,* 961 F.2d 188 (11th Cir.1992), decided on May 14,

---

[4]The majority appears to be "interested in the state of the law at the time of the alleged unconstitutional conduct, May 1, 1992." Majority at 3605 n. 13. Yet, the majority concedes that "this circuit, before May 1, 1992, had not had the opportunity to apply *T.L.O.* 's standards in factually similar circumstances," *id.* at 3605, and that "no case involving a student strip search had been presented to this court before the incidents in this case occurred," *id.* at 3608-09 n. 20.

1992, is inappropriate. *See* Majority at 3606, 3608-09 n. 20. Not only did that case involve the lawful, custodial strip search of a female high school student upon reasonable suspicion that she possessed contraband, but also *Justice* could not have been clearly established law for the subject strip searches of these second-graders that occurred thirteen days earlier. Equally inapplicable under our circuit definition of clearly established law as to the date in question is nonbinding case law of other federal circuit and district courts. *Cf.* id. at 3604 ("If the facts of other cases applying the balancing test or the test itself leads to such an "inevitable conclusion,' then the "bright-line' has been drawn."); *see id.* at 3609-10 & n. 21.

I agree that, for preexisting law to establish that a particular act is unlawful, it is not essential that the facts of the earlier case be identical to the facts surrounding the conduct that is being challenged as unlawful. For example, if a precedent holds that, under certain circumstances, it is unlawfully cruel to cut off two fingers, that precedent clearly would establish that it would be unlawful to cut off three fingers under the same circumstances. This case, however, has nothing to do with that kind of case law.[5] In this case, no precedent is factually close enough to have given much guidance to these schoolteachers under the circumstances. Sitting en banc, we have said—over Judge

---

[5]The majority observes that some conduct is so bad that no case needs to have recognized previously that such conduct violates federal law. Accepting this idea in principle, I am comfortable in saying that I think we face in this case no great act of pure evil (such as, to use the majority's example, slavery), that might trigger this rare and narrow exception to the extremely broad rule.

Kravitch's dissent—that public officials need not be able to draw analogies from earlier cases to avoid personal liability for damages. *Adams,* 998 F.2d at 923. For elementary schoolteachers to be competent in their jobs, it is not yet required that they think like a constitutional lawyer, much less like an activist one. Moreover, we have said repeatedly en banc—again in the face of Judge Kravitch's dissents—that the cases serving as precedent, those that supposedly established the law applicable to the circumstances in which a defendant public official found himself, must be materially similar factually to the circumstances confronting the defendant public official if that earlier case law is to guide public officials sufficiently to place them in jeopardy of losing immunity. *See Lassiter,* 28 F.3d at 1149-51; *Adams,* 998 F.2d at 923.

No decision cited in the majority opinion provides adequate precedent as clearly established law to guide the conduct of the schoolteachers in this case. Unlike many cases cited by the majority to support its decision, this case does not involve police officers or law enforcement. This case is about schools. Significantly, it concerns a specific type of school, an elementary school.

A high school and an elementary school are materially different places. The children in an elementary school are considerably younger and less mature, including less physically mature, than high school students. In elementary schools, the relationship between the teacher and students, who are young children, is much closer to that of parent and child than in high

schools, where the students are approaching adulthood. In the first two or three grades in elementary school, the notion of *in loco parentis,* where teachers stand in the place of parents, has real meaning and a long and venerable tradition.[6] For example, many a young schoolchild properly has been helped to change clothes, consisting of putting on or taking off clothes, by a schoolteacher.

The Supreme Court's *T.L.O.* decision involved a teenage high school student, obvious violation of the established school rule against smoking, and a consequent purse search revealing contraband. These facts materially distinguish *T.L.O.* from the case before us. The Supreme Court's opinion in *T.L.O.* was written against the background of the facts before it. While *T.L.O.* contains some general language to guide trial courts faced with searches by school employees, that standard is a broadly composed one: basically, it is a reasonableness test. The "reasonable under all the circumstances" rule in *T.L.O.* gives little practical guidance to teachers facing facts unlike those in *T.L.O.* As we

---

[6]The Court has recognized that "school authorities act[ ] *in loco parentis.*" *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 684, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986).

> Whether it should or should not do so, the American community calls upon its schools to, in substance, stand *in loco parentis* to its children for many hours of each school week.
>
> Citizens expect and demand that their children be physically safe in the schools to whose supervision they are consigned, and the citizenry is outraged if the schools are less than safe and orderly.

*Ferrell v. Dallas Indep. School Dist.,* 392 F.2d 697, 704 (5th Cir.) (Godbold, J., concurring), *cert. denied,* 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

explained en banc in *Lassiter,* an abstract standard is insufficient guidance until trial courts have demonstrated its application in various factual situations. *Lassiter,* 28 F.3d at 1150.

The facts of *T.L.O.* are too different from this case to have dictated to reasonable elementary schoolteachers that the searches conducted in this case already had been clearly established as unlawful. This conclusion, that is, that preexisting law did not dictate to reasonable teachers that their conduct in this case was unconstitutional, seems particularly strong upon consideration that the Supreme Court, aside from college and university cases, has never held any search based on individualized suspicions of a student by schoolteachers, including the *T.L.O.* search, to be unlawful under federal law, and neither have we or the former Fifth Circuit. Consequently, no bright lines had been delineated to help the teachers in this case to know what to do.[7]

While I agree that, for preexisting law to dictate a result in a particular case, the facts need not be exactly the same, they must be considerably closer than the analogies that the majority uses. Clearly established preexisting law is a pragmatic concept, which the Supreme Court has stressed repeatedly. In my judgment, clearly established law means what it says and our circuit cases teach that it means more than the majority of this panel seems to think that it means.

In conducting the challenged searches in this case, the

---

[7]Clearly, the facts and law in this case do not support the majority's decision that the elementary schoolteachers were not entitled to qualified immunity because their challenged searches were "in blatant disregard of the Fourth Amendment." Majority at 3610.

schoolteachers might not have exercised good judgment or done what was right, but that is a very different concept from concluding that they violated clearly established federal law. The schoolteachers' searches at issue in this case even may have violated the Fourth Amendment, but that conclusion is *not* unquestionably clear to me under our present circuit law.[8] It does

---

[8]After all, theft of money is hardly a trivial matter, and there was cause for suspicion. Nevertheless, the schoolteachers and the students were female, and the search was done in a relatively private place, the girls' restroom. I hasten to emphasize that conduct that may be constitutional also may be repugnant, ill-advised, and even outrageous. The strip searches in this case may have been offensive, but they did not violate clearly established constitutional law, when they occurred.

The core of the majority's opinion seems to be an effort to diminish the importance of this court's en banc decision in *Lassiter.* I cannot agree with this construction of a guiding circuit precedent. Inherently, en banc decisions are extremely important. This court does not go en banc lightly. We do so "(1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a). I believe that *Lassiter* went en banc on both grounds.

The majority stresses that *Lassiter* represented no "sea change" in the law of qualified immunity. Majority at 3601. That statement is absolutely correct because the great majority of the judges of this circuit regularly were applying the principles set forth in *Lassiter* before *Lassiter* was published. *See Lassiter*, 28 F.3d at 1149 ("No new rules need to be announced to decide this case. But, for emphasis, we restate principles which do govern qualified immunity cases."). A few judges of this court, however, were taking a significantly different approach to qualified immunity, an approach which was substantially more hostile to public official defendants. In this sense, *Lassiter* marks a substantial change for those judges who thought that, and acted as if, the law was something different from the law that *Lassiter* reiterates.

*Lassiter* seems particularly important when one realizes that this court had made a previous en banc effort to declare the law of the circuit not long before. *Adams,* 998 F.2d at 923. Informed observers refer to *Lassiter* as *Adams II.* When *Adams* proved ineffective to secure uniformity, the

seem plain to me, given *T.L.O.*'s sliding scale of reasonableness in view of all of the circumstances and the specific situation confronting the school personnel in this case, that by no means was it already clearly established *when* the school personnel acted that their conduct was unlawful.  To say otherwise is, I respectfully submit, to demote a common sense safeguard—clearly established law—to a legal fiction.

While explaining its decision, the majority has written many statements that conflict with the law of this circuit, as I understand it.  I am not going to bicker, however.  Whatever our precedents say, they speak for themselves.  Looking chiefly at *Lassiter,* the district judge believed that the law of this circuit required him to grant immunity.  I think that the judge was right, and I would affirm the district court's judgment.

---

court promptly went en banc again and produced *Lassiter* with its stronger and more definitive statements.  In my view, *Lassiter* is the law.